

ENTERED

AUG – 6 2009

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                              Deputy Clerk

**FILED**

AUG – 6 2009

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                              Deputy Clerk

1   GARY E. KLAUSNER (STATE BAR NO. 69077)
    gklausner@stutman.com
2   SCOTT H. YUN (STATE BAR NO. 185190)
    syun@stutman.com
3   AVI E. MUHTAR (STATE BAR NO. 260728)
    amuhtar@stutman.com
4   STUTMAN, TREISTER & GLATT
    PROFESSIONAL CORPORATION
5   1901 Avenue of the Stars, 12th Floor
    Los Angeles, CA 90067
6   Telephone: (310) 228-5600
    Telecopy: (310) 228-5788
7
    Bankruptcy Counsel for Debtor
8   and Debtor in Possession
9   Debtor's Mailing Address:
    401 S. Doubleday Avenue
10  Ontario, CA 91761

11              UNITED STATES BANKRUPTCY COURT

12               CENTRAL DISTRICT OF CALIFORNIA

13                     RIVERSIDE DIVISION

14  In re                                )  Case No. 6:09-bk-18312-TD
                                         )
15  PHOENIX MC, INC., a Delaware corporation, )  Chapter 11
                                         )
16                          Debtor.      )  **ORDER PURSUANT TO BANKRUPTCY**
                                         )  **CODE SECTIONS 105, 363 AND 365: (A)**
17                                       )  **AUTHORIZING THE DEBTOR TO SELL**
                                         )  **SUBSTANTIALLY ALL OF ITS ASSETS**
18  Tax I.D.  26-1212228                 )  **THROUGH AN AUCTION; AND (B)**
                                         )  **RETROACTIVELY APPROVING SALE**
19                                       )  **PROCEDURES**
                                         )
20                                       )           Hearing
                                         )
21                                       )  Date:  August 6, 2009
                                         )  Time:  9:00 a.m.
22                                       )  Place: Courtroom 1345
                                         )         255 E. Temple Street
23                                       )         Los Angeles, CA 90012
                                         )         or
24                                       )         Courtroom 303
                                         )         3420 Twelfth Street
25                                       )         Riverside, CA 92501
                                         )
26                                       )
                                         )
27  _____)

28

1        The "Motion for Order Pursuant to Bankruptcy Code Sections 105, 363 and 365: (A)

2    Authorizing the Debtor to Sell Substantially All of Its Assets Through an Auction; and (B)

3    Retroactively Approving Sale Procedures" (the "Sale Motion") filed by Phoenix MC, Inc., the debtor

4    and debtor in possession herein (the "Debtor"), came on for hearing on August 6, 2009 at 9:00 a.m.

5    (the "Sale Hearing") on regular notice before the Honorable Thomas B. Donovan, United States

6    Bankruptcy Judge for the Central District of California.

7        Gary E. Klausner and Scott H. Yun of Stutman, Treister & Glatt, P.C. appeared on

8    behalf of the Debtor. Lisa Hill Fenning and Harry Garner of Dewey & LeBoeuf LLP appeared on

9    behalf of Al Yousuf, LLC ("AYL"). Lewis Landau appeared on behalf of the Committee of

10    Creditors Holding Unsecured Claims (the "Committee"). James Timko of Allen, Matkins, Leck,

11    Gamble, Mallory & Natsis LLP appeared on behalf of MEF Realty LLC ("MEF"). Other

12    appearances are as reflected on the Court's record.

13        **NOW, THEREFORE**, the Court having considered the Sale Motion and the Notice

14    of the Sale Motion [Docket Nos. 83 and 84], the Declarations of Dennis Hogan (the "Hogan

15    Declaration") and Kent Redwine (the "Redwine Declaration") in support of the Sale Motion [Docket

16    Nos. 85 and 86], the Committee's opposition to the Sale Motion [Docket No. 101], MEF's limited

17    opposition to the Sale Motion [Docket No. 96], the Debtor's reply to the Committee's opposition and

18    MEF's limited opposition to the Sale Motion and the Supplemental Declaration of Dennis Hogan

19    [Docket No. 105], AYL's reply to the Committee's opposition to the Sale Motion [Docket No. 107],

20    other pleadings and papers filed in support of the Sale Motion, including Debtor's Supplemental

21    Statement Regarding the Sale Motion  (the "Statement Regarding Submission of Bids") [Docket No.

22    109], which reflects that the only Qualified Bid received was the bid submitted by AYL, and

23    Debtor's Notice Of Submission Of Asset Purchase Agreement Dated August 5, 2009 In Support Of

24    the Sale Motion [Docket No. 113] (the "Notice of Submission of Asset Purchase Agreement"); the

25    evidence proffered or adduced at, and arguments of counsel made at the Sale Hearing; and upon the

26    entire record of the Sale Hearing and this case; and good cause appearing thereof;

27        **IT IS HEREBY FOUND AND CONCLUDED**, pursuant to Rules 7052 and 9014 of

28    the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rule"), that:

1        A.     The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157

2 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

3 Venue of this chapter 11 case and the Sale Motion in this district is proper under 28 U.S.C. §§ 408

4 and 1409.

5        B.     Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale

6 Hearing, and the assumption and assignment of the Assigned Contracts[1] has been provided in

7 accordance with sections 102(1), 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules

8 2002, 6004 and 9014, and such notice was good and sufficient, and appropriate under the particular

9 circumstances, and no other or further notice of the Sale Motion, the Sale Hearing, and the

10 assumption and assignment of the Assigned Contracts or the entry of this Sale Order is required.

11        C.     The Sale Procedures proposed by the Debtor, a copy of which is attached as

12 Exhibit "1" to the Sale Motion [Docket No. 83], are reasonable and appropriate and represent the

13 best method for obtaining the highest and best offer for the Assets, in order to maximize the value of

14 such assets for the benefit of the Debtor's estate.

15        D.     The Sale Procedures provided a transparent and fair mechanism to govern the

16 marketing and sale of the Assets.

17        E.     The Debtor has followed the Sale Procedures for soliciting, analyzing and

18 determining Qualified Bids for the Sale Motion and the Sale Hearing and the assumption and

19 assignment of the Assigned Contracts.

20        F.     The Sale Procedures have been fully complied with in all material respects.

21        G.     A reasonable opportunity to object or be heard with respect to the Sale Motion

22 and the relief requested therein has been afforded to all creditors, equity interest holders, interested

23 persons and entities.

24        H.     Creditors, parties-in-interest and other entities have been afforded a

25 reasonable opportunity to bid for the Assets pursuant to the Sale Procedures. The Debtor marketed

26

27

---

28  [1]   All Capitalized terms not defined herein have the same meaning set forth in the Sale Motion.

2

the Assets and the sale process in compliance with the Sale Procedures and the requirements of applicable law.

I.      AYL was the only party that submitted a Qualified Bid for the Assets. No other person or entity submitted a Qualified Bid by the deadline established in the Sale Procedures, and, except for AYL, no person or entity has submitted a bid of any sort since such deadline. As a result, pursuant to the terms of the Sale Procedures, the Debtor was not required to conduct the Auction, and the credit bid submitted by AYL is the highest and best offer for the Assets.

J.      The Asset Purchase Agreement executed by AYL and Phoenix Cars LLC ("PLC," and together with AYL, "Purchaser"), a copy of which is attached to the Notice of Submission of Asset Purchase Agreement [Docket No. 113], reflects the exercise of the Debtor's sound business judgment.

K.      The Debtor has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby. The Debtor has all the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement.

L.      Approval at this time of the Asset Purchase Agreement and consummation of the sale, including, without limitation, the assumption and assignment of the Assigned Contracts, is in the best interests of the Debtor and its creditors and estate.

M.      The Debtor has demonstrated good, sufficient and sound business purpose and justification for the sale of the Assets to Purchaser. The Debtor has also demonstrated compelling circumstances for the sale and the assumption and assignment of the Assigned Contracts designated in Purchaser's Asset Purchase Agreement for assumption and assignment (the "Designated Assigned Contracts"), without the filing and confirmation of a chapter 11 plan in this case, including, without limitation, that the Debtor has insufficient funding to continue its on-going business operations and, as a result, the value of the Assets is likely to depreciate rapidly in the absence of the sale.

N.      The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtor and Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtor nor Purchaser has engaged in any conduct that would cause or permit

1  the Asset Purchase Agreement or the sale to be avoided under section 363(n) of the Bankruptcy

2  Code.

3         O.    Purchaser is a good faith purchaser within the meaning of section 363(m) of

4  the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Purchaser

5  will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing

6  the transactions contemplated by the Asset Purchase Agreement. The Asset Purchase Agreement

7  was not entered into for the purpose of hindering, delaying or defrauding creditors under the

8  Bankruptcy Code and under the laws of the United States or any state, territory, possession, or

9  district thereof.

10         P.    The terms and conditions of the Asset Purchase Agreement and the purchase

11  price thereunder (i) are fair and reasonable, (ii) represent the highest and best offer for the Assets,

12  (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other

13  practical alternative and (iv) constitute fair consideration.

14         Q.    The Debtor may sell the Assets free and clear of all liens, claims,

15  encumbrances and interests of any kind or nature whatsoever except those expressly assumed in the

16  Asset Purchase Agreement or this Sale Order because, in each case, one or more of the requirements

17  set forth in section 363(f) (2) and (4) of the Bankruptcy Code has been satisfied. Specifically, AYL is the

18  only creditor or party in interest with valid liens, claims, encumbrances or interests against the

19  Assets, and AYL has consented to the sale free and clear of its liens pursuant to Bankruptcy Code

20  section 363(f)(2). To the extent that anyone else may have liens, claims, encumbrances or interests

21  against the Assets, those non-debtor parties with liens, claims, encumbrances and interests of any

22  kind or nature whatsoever in the Assets who did not object to the Sale Motion and the assumption

23  and assignment of the Designated Assigned Contracts are deemed to have consented pursuant to

24  sections 363(f)(2) and 365 of the Bankruptcy Code.

25         R.    The transfer of the Assets to Purchaser will vest Purchaser with good and

26  marketable title to the Assets.

27         S.    Consummation of the sale, including, without limitation, the transfer of the

28  Assets to Purchaser will not subject Purchaser to any debts, liabilities, obligations, commitments,

4

1    responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent

2    or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtor, any affiliate

3    of the Debtor, or any other person by reason of such transfers and assignments, including, without

4    limitation, based on any theory of antitrust or successor or transferee liability, except that Purchaser

5    shall only be liable for payment of the liabilities set forth in this Sale Order or assumed in the Asset

6    Purchase Agreement.

7           T.    Purchaser will not consummate the sale, the assumption and assignment of the

8    Designated Assigned Contracts and other transactions contemplated thereby if the sale of the Assets

9    to Purchaser is not free and clear of all liens, claims, encumbrances and interests of any kind or

10    nature whatsoever, except those expressly assumed by Purchaser in the Asset Purchase Agreement

11    and the MEF Obligations (defined below), or if Purchaser would, or in the future could, be liable for

12    any liens, claims, encumbrances and interests of any kind or nature whatsoever, except those

13    expressly assumed by Purchaser in the Asset Purchase Agreement and the MEF Obligations.

14           U.    Under section 365 of the Bankruptcy Code, the only amounts (including,

15    without limitation, cure costs) that must be paid in order for the Debtor to assume and assign the

16    Designated Assigned Contracts to Purchaser are set forth in Schedule 1.7 to the Asset Purchase

17    Agreement.

18           V.    Purchaser has (i) cured, or provided adequate assurance of curing, any default

19    existing prior to the date hereof under each of the Designated Assigned Contracts, within the

20    meaning of Section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation or adequate

21    assurance of compensation to any party for any actual pecuniary loss to such party resulting from a

22    default prior to the date hereof under any of the Designated Assigned Contracts, within the meaning

23    of Section 365(b)(1)(B) of the Bankruptcy Code, and (iii) provided adequate assurance of

24    Purchaser's future performance of the Designated Assigned Contracts, within the meaning of

25    Section 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. The Cure Amount for any

26    Designated Assigned Contracts must be paid to the non-debtor party to such contracts on or before

27    the closing (the "Closing") of the sale of the Assets.

28

W.    Purchaser's undertaking to fulfill all future performance obligations under the Designated Assigned Contracts, upon the assumption and assignment to Purchaser thereof, is hereby found to be adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code.

X.    No defaults exist in the Debtor's performance under the Designated Assigned Contracts as of the date of this Sale Order other than the failure to pay amounts equal to the Cure Amounts set forth in Schedule 1.7 of the Asset Purchase Agreement.

Y.    Cause exists to waive the automatic 10 day stay imposed by Bankruptcy Rules 6004(g) and 6006(d) because the Debtor does not have sufficient funds to operate its business past the first week of August 2009.  There are no legal or equitable reasons to delay the Closing of the sale.

Z.    To the extent any of the foregoing findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** as follows:

1.    The Sale Procedures are hereby approved retroactively.

2.    The Sale Motion is granted.

3.    Except as otherwise addressed in this Sale Order, all objections to the Sale Motion and entry of this Sale Order that have not been withdrawn, waived or settled are hereby overruled on the merits.  All persons and entities given notice of the Sale Motion that failed to timely object thereto are deemed to consent to the relief sought therein, including, without limitation, all non-debtor parties to the Assigned Contracts.

4.    The Asset Purchase Agreement and the transactions contemplated thereby are hereby approved in all respects.  The transfer of the Assets by the Debtor to Purchaser shall be a legal, valid and effective transfer of the Assets.  The Closing of the sale and the other transactions contemplated thereby are hereby approved and authorized under section 363(b) of the Bankruptcy Code.

6

1         5.    Pursuant to section 365 of the Bankruptcy Code, the Debtor shall assume and

2    assign to Purchaser the Designated Assigned Contracts identified in Schedule 1.7 of the Asset

3    Purchase Agreement free and clear of all liens and claims, except for the MEF Obligations.

4         6.    Notwithstanding any other provision in this Sale Order or in the Asset

5    Purchase Agreement, as to that certain Airport Commerce Center Industrial Lease (Triple Net) dated

6    October 8, 2007 between MEF Realty, LLC, a Delaware Limited Liability company ("MEF"), as

7    lessor, and Debtor, as tenant, for the premises commonly known as 301 and 401 Doubleday Avenue,

8    Ontario, California (as amended, the "MEF Lease"), Purchaser shall be responsible for and hereby

9    assumes any and all obligations under the MEF Lease, regardless of whether such obligations relate

10   to any pre or post assumption Closing period (the "MEF Obligations").

11        7.    In addition to the curing of all defaults under the Lease and complying with

12   section 6 above, notwithstanding any other provision in this Sale Order or the Asset Purchase

13   Agreement, the assumption and assignment of the MEF Lease under section 365 of the Bankruptcy Code

14   is subject to (i) PLC entering into an amendment to the MEF Lease (the "Amendment") that is

15   substantially similar to the form attached hereto as Exhibit "A" and PLC's provision of a letter of

16   credit in the amount of $30,000 subject to the terms of the Amendment; and (ii) Purchaser providing

17   MEF with any and all disclosures required by law, including the names of any party owning 10% or

18   more of the Purchasers as required under the Patriot Act.  Failure to execute the Amendment, to

19   provide the required letter of credit, or to provide the required disclosures within ten (10) business

20   days of the entry of this Sale Order shall result in the immediate rejection of the Lease and the lifting

21   of the automatic stay under section 362 of the Bankruptcy Code. MEF

22        8.    Notwithstanding any other provisions of this Sale Order or the Asset Purchase

23   Agreement, the existing security deposit in the amount of $67,026.96 (the "Security Deposit") that

24   secures the MEF Lease shall remain in effect and continue to secure all of Purchaser's obligations

25   under the MEF Lease as amended by the Amendment.  Pursuant to this Sale Order, the Debtor

26   waives any right, title, or interest in the Security Deposit.

27

28

1        9.    Immediately upon the Closing of the Sale, Purchaser shall pay MEF the

2  amount of $6,000 for its attorneys fees and costs which were incurred in connection with the Sale in

3  accordance with section 32.4 of the MEF Lease.

4        10.    Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is

5  authorized to and shall sell, and Purchaser shall buy, the Assets on the terms and conditions set forth

6  in the Asset Purchase Agreement free and clear of all mortgages, deeds of trust, security interests,

7  pledges, liens, judgments, demands, encumbrances, easements, restrictions or charges, rights-of-

8  way, covenants, encroachments, building, use, voting or other restrictions, conditional sale or other

9  title retention agreements and interests (as defined in Section 363(f) of the Bankruptcy Code) of any

10  kind or nature, whether incurred voluntarily or arising by operation of law (the foregoing

11  collectively referred to as "Liens" herein), and all debts arising in any way in connection with any

12  acts of the Debtor, claims (as that term is defined in the Bankruptcy Code), obligations, liabilities,

13  demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of

14  any kind and nature, arising prior to the closing or relating to acts occurring prior to the Closing,

15  whether imposed by agreement, understanding, law, equity or otherwise and whether known or

16  unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise (the foregoing

17  collectively referred to as "Claims" herein), other than Liens and Claims that are expressly assumed

18  by Purchaser in the Asset Purchase Agreement and the MEF Obligations.

19        11.    In furtherance of the foregoing and except for any Liens and Claims that

20  Purchaser is expressly assuming in the Asset Purchase Agreement and the MEF Obligations,

21  Purchaser is not assuming nor shall it in any way whatsoever be liable or responsible, as a successor

22  or otherwise, for any Liens or Claims of the Debtor or Liens or Claims in any way whatsoever

23  relating to or arising from the Assets or the Debtor's operations or use of the Assets, including,

24  without limitation, the Assigned Contracts, on or prior to the Closing. Any Liens or Claims that in

25  any way whatsoever relate to periods on or prior to the Closing or are to be observed, paid,

26  discharged or performed on or prior to the Closing (in each case, including any Liens or Claims that

27  result from, relate to or arise out of tort or other product liability claims) or any Liens or Claims

28  calculable by reference to the Debtor or their assets or operations, or relating to continuing

*[Handwritten annotation:]* Except as otherwise provided in this Sale Order,

1   conditions existing on or prior to the Closing, are hereby extinguished insofar as they may give rise

2   to successor liability, without regard to whether the claimant asserting any such Liens or Claims has

3   delivered to Purchaser a release thereof.

4      12. Except as expressly permitted or otherwise specifically provided by the Asset

5   Purchase Agreement or this Sale Order, all parties holding Liens or Claims of any kind or nature

6   whatsoever against or in the Debtor, or the Assets (whether legal or equitable, secured or unsecured,

7   matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of,

8   in connection with, or in any way relating to, the Debtor, the Assets, the operation of the Debtor's

9   business prior to the Closing , or the transfer of the Assets to Purchaser, hereby are forever barred,

10  estopped, and permanently enjoined from asserting such persons' or entities' Liens or Claims against

11  Purchaser, its successors or assigns, property, or assets, which Liens and Claims are hereby

12  extinguished, whether or not a party asserting any such Lien or Claim has delivered to Purchaser a

13  release thereof.

14     13. In the absence of a stay pending appeal, if Purchaser and the Debtor elect to

15  close under the Asset Purchase Agreement at any time after entry of this Sale Order, then, with

16  respect to the Sale, Purchaser, as a purchaser in good faith, shall be entitled to the protections of

17  section 363(m) of the Bankruptcy Code if this Sale Order or any authorization contained herein is

18  reversed or modified on appeal.

19     14. In the event that any person or entity (as those terms are defined in the

20  Bankruptcy Code) which has filed statements or other documents or agreements evidencing Liens on

21  the Assets has not delivered to the Debtor prior to the Closing, in proper form for filing and executed

22  by the appropriate parties, termination statements, instruments of satisfactions, releases of Liens

23  which such person or entity has with respect to the Assets, the Debtor or Purchaser, on behalf of the

24  Debtor, is authorized and directed to execute and file or record such statements, instruments,

25  releases, and other documents on behalf of the person or entity with respect to the Assets.

26     15. All entities that are presently, or at the Closing may be, in possession of some

27  or all of the Assets are hereby directed to surrender possession of said assets to Purchaser at the

28  Closing.

9

1    16.    The Debtor is authorized to execute, acknowledge and deliver such corporate

2    name change certificates, deeds, assignments, conveyances, and other assurances, documents, and

3    instruments of transfer and take such other action that may be reasonably necessary to perform the

4    terms and provisions of the Asset Purchase Agreement, and shall take any other action for purposes

5    of assigning, transferring, granting, conveying, and confirming to Purchaser, or reducing to

6    possession, any or all of the Assets and to execute such nonmaterial amendments to the Asset

7    Purchase Agreement and related agreements as may be required to effectuate the letter and intent of

8    the Asset Purchase Agreement and the consummation of the Sale.

9    17.    At the Closing, Purchaser shall pay the Cure Amounts to the non-debtor

10   parties to the Designated Assigned Contracts that Purchaser has designated for assumption and

11   assignment in Schedule 1.7 of the Asset Purchase Agreement.

*In addition to the Cure Amounts, to the extent not already paid, Purchaser shall pay all rent obligations under the MEF Lease.*

*J+T*

*feh*

*46 P*

12   18.    The Designated Assigned Contracts listed in Schedule 1.7 of the Asset

13   Purchase Agreement shall, upon assignment to Purchaser, be deemed to be valid and binding and in

14   full force and effect and enforceable in accordance with their respective terms, except as otherwise

15   specifically determined by the Court, notwithstanding any provision in any such Designated

16   Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the

17   Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer.

18   19.    Except with respect to MEF and the MEF Obligations, at the Closing, each

19   non-debtor party to a Designated Assigned Contract is hereby forever barred, estopped, and

20   permanently enjoined from asserting against the Debtor, Purchaser, or the property of any of them,

21   any default existing as of the date of the Sale Hearing, or any counterclaim, defense, setoff or any

22   other claim asserted or assertable against the Debtor.

23   20.    Other than the Designated Assigned Contracts identified in Schedule 1.7 of

24   the Asset Purchase Agreement, Purchaser assumes none of the Debtor's other leases and contracts

25   and shall have no liability whatsoever thereunder.

26   21.    This Court retains jurisdiction to (i) enforce and implement the terms and

27   provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents

28   thereunder, and each of the agreements executed in connection therewith, (ii) compel delivery of the

1   Assets to Purchaser, (iii) compel performance under the Asset Purchase Agreement, (iv) resolve any

2   disputes, controversies or claims arising out of or relating to the Asset Purchase Agreement, (v)

3   interpret, implement and enforce the provisions of this Sale Order, and (vi) protect Purchaser against

4   any claims, causes of action or other liabilities of whatever nature that it did not expressly assume

5   under the Asset Purchase Agreement.

6       22.    The provisions of this Sale Order authorizing the Debtor to enter into the

7   Asset Purchase Agreement and authorizing the transactions contemplated thereby shall be self-

8   executing, and neither the Debtor nor Purchaser shall be required to execute or file any releases,

9   termination statements, assignments, consents, or other instruments in order to effectuate

10  consummation to implement the foregoing provisions hereof except as expressly provided in the

11  Asset Purchase Agreement.  Notwithstanding the foregoing, the Debtor, Purchaser and all other

12  parties are authorized and directed to take any and all actions necessary and appropriate to

13  effectuate, consummate and implement fully the Asset Purchase Agreement.

14      23.    This Sale Order is binding upon and inures to the benefit of any successors or

15  assigns of the Debtor or Purchaser, including any trustee appointed in this case.

16      24.    This Sale Order is and shall be (i) effective as a determination that other than

17  the MEF Obligations, at the Closing, all Liens and Claims existing as to the Assets prior to the

18  Closing have been unconditionally released, discharged and terminated, and that the conveyance of

19  the Assets described herein have been effected, and (ii) binding upon and shall govern the acts of all

20  entities, including, without limitation, all filing agents, filing officers, title agents, title companies,

21  recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or

22  other intellectual property, administrative agencies, governmental departments, secretaries of state,

23  federal, state, and local officials, and all other persons and entities who may be required by operation

24  of law, the duties of their office, or contract, to accept, file, register or otherwise record or release

25  any documents or instruments, or who may be required to report or insure any title or state of title in

26  or to any of the Assets.

27      25.    Except with respect to MEF, no claim of any kind asserted by the Debtor at

28  any time against any party to any one of the Designated Assigned Contracts shall entitle such party

11

1  to assert, as against Purchaser, any claim, counterclaim, defense or offset, or affect or impair in any

2  respect the obligations of such party to Purchaser under any one of the Designated Assigned

3  Contracts.

4       26.    The Court hereby orders that the ten-day stays under Bankruptcy Rules

5  6004(g) and 6006(d) shall not be in effect with respect to the sale and the other transactions

6  contemplated in the Asset Purchase Agreement (including, without limitation, the assumption and

7  assignment to Purchaser of the Designated Assigned Contracts), and thus this Sale Order shall be

8  effective and enforceable immediately upon entry.

9       27.    The provisions of this Sale Order and the Asset Purchase Agreement are non-

10  severable and mutually dependent.

11       28.    The Asset Purchase Agreement and any related agreements, documents or

12  other instruments may be modified, amended or supplemented by the parties thereto in accordance

13  with the terms thereof without further order of the Court, provided that any such modification,

14  amendment or supplement is not material.

15        **IT IS SO ORDERED**.

16

17  Dated: ____ 8/6/09 _____

18                  _Thomas B. Donovan_

19                  HONORABLE THOMAS B. DONOVAN
                UNITED STATES BANKRUPTCY JUDGE

20  Submitted by:

21

22  _Gary E. Klausner_

23  Gary E. Klausner,
   Scott H. Yun, and

24  Avi E. Muhtar, a Member of
   Stutman, Treister & Glatt, P.C.

25  Bankruptcy Counsel for Debtor and
   Debtor in Possession

26

27

28

12

## EXHIBIT A

**FORM OF LEASE AMENDMENT**

## SECOND AMENDMENT TO INDUSTRIAL LEASE

This SECOND AMENDMENT TO INDUSTRIAL LEASE (this **"Amendment"**) is made and entered into as of _____, 2009, by and between MEF REALTY, LLC, a Delaware limited liability company (**"Landlord"**), and PHOENIX CARS LLC, a Delaware limited liability company (**"Tenant"**) as assignee of Phoenix MC, Inc., a Delaware corporation (**"Phoenix MC"**).

## R E C I T A L S :

A.        Landlord and Phoenix MC entered into that certain Industrial Lease dated as of October 8, 2007 (the **"Original Lease"**) and amended by that certain First Amendment to Industrial Lease dated September 30, 2008 (the **"First Amendment"**) (the Original Lease together with the First Amendment may hereinafter collectively be referred to as the **"Lease"**), pursuant to which Landlord leases to Tenant and Tenant leases from Landlord certain premises containing approximately 40,642 rentable square feet of space (the " **Premises**") comprising the entire rentable square feet of those certain buildings located at 301 and 401 Doubleday Avenue, Ontario, California 91761 (the **"Buildings"**).

B.        Pursuant to orders given by the United States Bankruptcy Court (the **"Court"**), Case No. 6:09-bk-18312-TD, Phoenix MC assumed and assigned to Tenant, and Tenant assumed all obligations under, the Lease as part of the sale of assets of Phoenix MC to Tenant (the **"Sale"**).

C.        As a condition precedent to the assumption and assignment of the Lease, Tenant agreed to execute following the Sale an amendment modifying various terms and provisions of the Lease, all as hereinafter provided.

## A G R E E M E N T :

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.        Capitalized Terms, Recitals. All capitalized terms when used herein shall have the same meaning as is given such terms in the Lease unless expressly superseded by the terms of this Amendment. The Lease, including all exhibits and schedules attached thereto, is incorporated into this Amendment by this reference. The above Recitals are incorporated herein by this reference and agreed to be true and materially complete. Landlord and Tenant acknowledge the obligations and terms of the sale order entered by the Court (**"Sale Order"**) and hereby agree that the Lease, as amended hereby (the **"Amended Lease"**), shall be subject to the Sale and Sale Order.

2.        Condition of Premises. Tenant is in possession of the Premises and shall continue its occupancy of same in its current "AS-IS" condition without any agreements, representations, understandings or obligations on the part of Landlord to perform or pay for any alterations, repairs or improvements to the Premises, except as otherwise expressly provided in the Lease.

3.        Letter of Credit.

3.1.        Concurrently with Tenant's execution of this Amendment, Tenant shall deliver to Landlord, as additional collateral for the full performance by Tenant of all of its obligations under the Amended Lease, and for all losses and damages Landlord may suffer as a result of any default by Tenant under the Amended Lease, including, but not limited to, any post lease termination damages under section 1951.2 of the California Civil Code, a standby, unconditional, irrevocable, transferable letter of credit (the

"**Letter of Credit**") in the form of **Exhibit A** hereto and containing the terms required herein, in the face amount of Thirty Thousand and No/100ths Dollars ($30,000.00) (the "**Letter of Credit Amount**"), naming Landlord as beneficiary, issued by a United States-based financial institution with a Moody's Baseline Credit Assessment of no less than "Aa3" acceptable to Landlord in Landlord's sole discretion, permitting multiple and partial draws thereon, presentable at the local office of the financial institution in Orange County, California, and otherwise in form acceptable to Landlord in its sole discretion, including, without limitation, in accordance with International Standby Practices 1998. Tenant shall cause the Letter of Credit to be continuously maintained in effect (whether through replacement, renewal or extension) in the Letter of Credit Amount through the date (the "**Final LC Expiration Date**") that is 120 days after the scheduled expiration date of the Term or any renewal Term of the Lease. If the Letter of Credit held by Landlord expires earlier than the Final LC Expiration Date (whether by reason of a stated expiration date or a notice of termination or non-renewal given by the issuing bank), Tenant shall deliver a new Letter of Credit or certificate of renewal or extension to Landlord not later than thirty (30) days prior to the expiration date of the Letter of Credit then held by Landlord. Any renewal or replacement Letter of Credit shall comply with all of the provisions of this Section 3, shall be irrevocable, transferable and shall remain in effect (or be automatically renewable) through the Final LC Expiration Date upon the same terms as the expiring Letter of Credit or such other terms as may be acceptable to Landlord in its sole discretion.

3.2.    Landlord shall have the immediate right to draw upon the Letter of Credit, in whole or in part, at any time and from time to time: (i) If an event of default occurs and is not cured within the applicable cure period provided for such default in the Lease and/or to compensate Landlord for any and all damages it suffers upon termination of the Lease; (ii) If the Letter of Credit held by Landlord expires (or is set to expire) earlier than the Final LC Expiration Date (whether by reason of a stated expiration date or a notice of termination or non-renewal given by the issuing bank), and Tenant fails to deliver to Landlord, at least thirty (30) days prior to the expiration date of the Letter of Credit then held by Landlord, a renewal or substitute Letter of Credit that is in effect and that complies with the provisions of this Section 3; or (iii) Tenant either files a voluntary petition, or an involuntary petition is filed against Tenant by an entity other than Landlord or an affiliate thereof, under any chapter of the Federal Bankruptcy Code, Tenant executes an assignment for the benefit of creditors or Tenant is placed in receivership or otherwise becomes insolvent. No condition or term of the Amended Lease shall be deemed to render the Letter of Credit conditional to justify the issuer of the Letter of Credit in failing to honor a drawing upon such Letter of Credit in a timely manner. Tenant hereby acknowledges and agrees that Tenant is entering into this Amendment in material reliance upon the ability of Landlord to draw upon the Letter of Credit upon the occurrence of any event of default by Tenant under the Amended Lease or upon the occurrence of any of the other events described above in this Section 3.2.

3.3.    The proceeds of the Letter of Credit shall constitute Landlord's sole and separate property (and not Tenant's property or the property of Tenant's bankruptcy estate) and Landlord may immediately upon any draw (and without notice to Tenant) apply or offset the proceeds of the Letter of Credit: (i) against any rent payable by Tenant under the Amended Lease that is not paid when due; (ii) against all losses and damages that Landlord has suffered or that Landlord reasonably estimates that it may suffer as a result of any default by Tenant under the Amended Lease, including any damages arising under section 1951.2 of the California Civil Code following termination of the Amended Lease; (iii) against any costs incurred by Landlord in connection with the Amended Lease (including attorneys' fees); and (iv) against any other amount that Landlord may spend or become obligated to spend by reason of Tenant's default. Provided Tenant has performed all of its obligations under the Amended Lease, Landlord agrees to pay to Tenant within thirty (30) days after the Final LC Expiration Date the amount of any proceeds of the Letter of Credit received by Tenant and not applied as allowed above; provided, that if prior to the Final LC Expiration Date a voluntary petition is filed by Tenant or any Guarantor, or an involuntary petition is filed against Tenant or any Guarantor by any of Tenant's or Guarantor's creditors, under the Federal Bankruptcy Code, then Landlord shall not be obligated to make such payment in the

amount of the unused Letter of Credit proceeds until either all preference issues relating to payments under the Amended Lease have been resolved in such bankruptcy or reorganization case or such bankruptcy or reorganization case has been dismissed, in each case pursuant to a final court order not subject to appeal or any stay pending appeal.

3.4. If, as result of any application or use by Landlord of all or any part of the Letter of Credit, the amount of the Letter of Credit shall be less than the Letter of Credit Amount, Tenant shall, within five (5) days thereafter, provide Landlord with additional letter(s) of credit in an amount equal to the deficiency (or a replacement letter of credit in the total Letter of Credit Amount), and any such additional (or replacement) letter of credit shall comply with all of the provisions of this Section 3, and if Tenant fails to comply with the foregoing, notwithstanding anything to the contrary contained in the Amended Lease, the same shall, at Landlord's election, constitute an uncurable event of default by Tenant. Tenant further covenants and warrants that it will neither assign nor encumber the Letter of Credit or any part thereof and that neither Landlord nor its successors or assigns will be bound by any such assignment, encumbrance, attempted assignment or attempted encumbrance.

3.5. Landlord may, at any time and without notice to Tenant and without first obtaining Tenant's consent thereto, transfer all or any portion of its interest in and to the Letter of Credit to another party, person or entity, including Landlord's mortgagee and/or to have the Letter of Credit reissued in the name of Landlord's mortgagee. If Landlord transfers its interest in the Buildings and transfers the Letter of Credit (or any proceeds thereof then held by Landlord) in whole or in part to the transferee, Landlord shall, without any further agreement between the parties hereto, thereupon be released by Tenant from all liability therefor. The provisions hereof shall apply to every transfer or assignment of all or any part of the Letter of Credit to a new landlord. In connection with any such transfer of the Letter of Credit by Landlord, Tenant shall, at Tenant's sole cost and expense, execute and submit to the issuer of the Letter of Credit such applications, documents and instruments as may be necessary to effectuate such transfer. Tenant shall be responsible for paying the issuer's transfer and processing fees in connection with any transfer of the Letter of Credit and, if Landlord advances any such fees (without having any obligation to do so), Tenant shall reimburse Landlord for any such transfer or processing fees within ten days after Landlord's written request therefor.

3.6. Landlord and Tenant: (1) acknowledge and agree that in no event or circumstance shall the Letter of Credit or any renewal thereof or substitute therefor or any proceeds thereof be deemed to be or treated as a "security deposit" under any Law applicable to security deposits in the commercial context including Section 1950.7 of the California Civil Code, as such section now exists or as may be hereafter amended or succeeded ("**Security Deposit Laws**"), (2) acknowledge and agree that the Letter of Credit (including any renewal thereof or substitute therefor or any proceeds thereof) is not intended to serve as a security deposit, and the Security Deposit Laws shall have no applicability or relevancy thereto, and (3) waive any and all rights, duties and obligations either party may now or, in the future, will have relating to or arising from the Security Deposit Laws with respect to the Letter of Credit. Further, with respect to the Letter of Credit, Tenant hereby waives the provisions of Section 1950.7 of the California Civil Code and all other provisions of Law, now or hereafter in effect, which (i) establish the time frame by which Landlord must refund a security deposit under a lease, and/or (ii) provide that Landlord may claim from the Security Deposit only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums specified in this Section 3 and/or those sums reasonably necessary to compensate Landlord for any loss or damage caused by Tenant's breach of the Amended Lease or the acts or omissions of Tenant or any of Tenant's Parties, including any damages Landlord suffers following termination of the Amended Lease.

4. <u>Security Deposit</u>. Landlord currently holds a Security Deposit in the amount of Sixty-Seven Thousand Twenty-Six and 96/100ths Dollars ($67,026.96). Notwithstanding anything to the

contrary in Section 3 above, the Security Deposit shall remain subject to the terms and conditions of the Lease with respect to the time frame by which Landlord must return the Security Deposit to Tenant and Landlord shall continue to hold such Security Deposit in accordance with the terms of the Lease, including, without limitation, Section 5 of the Original Lease.

5.       Broker.  Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Amendment, and that they know of no real estate broker or agent who is entitled to a commission in connection with this Amendment. Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments and costs and expenses (including, without limitation, reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of the indemnifying party's dealings with any real estate broker or agent.

6.       Counterparts.  This Amendment may be executed in multiple counterparts, each of which is to be deemed original for all purposes, but all of which together shall constitute one and the same instrument.

7.       No Further Modification.  Except as set forth in this Amendment, all of the terms and provisions of the Lease shall remain unmodified and in full force and effect.

IN WITNESS WHEREOF, this Amendment has been executed as of the day and year first above written.

"LANDLORD"

MEF REALTY, LLC,
a Delaware limited liability company

By:   MULLER EQUITY FUND LLC,
a Delaware limited liability company,
its sole member

     By:   MEF PARTNERS LLC,
a California limited liability company,
its Managing Member

          By:   _____
Name: Jon Muller
Title: Manager

"TENANT"

PHOENIX CARS LLC,
a Delaware limited liability company

By:   _____
Name: _____
Title: _____

By:   _____
Name: _____
Title: _____

## EXHIBIT A

### FORM OF LETTER OF CREDIT

[BANK LETTERHEAD]

_____, 2009

IRREVOCABLE, UNCONDITIONAL LETTER OF CREDIT NO. ____

MEF REALTY, LLC
c/o The Muller Company
23521 Paseo de Valencia, Suite 200
Laguna Hills, California 92653
Attn: Jon Muller

Gentlemen:

_____, a _____ ("Bank") **[PLEASE PROVIDE
NAME OF BANK]**, of_____, _____ hereby issues its Irrevocable, Unconditional Letter
of Credit in favor of MEF REALTY, LLC, a Delaware limited liability company, and/or its successors
and assigns ("**Landlord**"), for the account of PHOENIX CARS LLC, a Delaware limited liability
company (jointly, severally and collectively, "**Tenant**") up to the aggregate amount of Thirty Thousand
and No/100ths Dollars ($30,000.00) (US Dollars), available at sight by the drafts of Landlord on the
Bank. Drafts drawn on this Letter of Credit will be honored when presented, accompanied only by a
letter or certificate purportedly signed by a representative of Landlord stating that Landlord is entitled to
draw on this Letter of Credit under the terms of that certain Industrial Lease dated as of October 8, 2007
as amended by that certain First Amendment to Industrial Lease dated September 30, 2008 and that
certain Second Amendment to Industrial Lease dated _____ ___, 2009, between Landlord and
Tenant. Multiple and partial draws shall be permitted hereunder. This Letter of Credit is transferable in
whole or in part. The Bank shall look solely to Tenant for payment of any fee for such transfer. Such
payment is not a condition to transfer.

The Bank shall be entitled (and required) to rely upon the statements contained in the above-
described letter or certificate and will have no obligation to verify the truth of any statements set forth
therein.

The Bank hereby agrees with drawers, endorsers, and bona fide holders of this Letter of Credit
that all drafts drawn by reason of this Letter of Credit and in accordance with the above conditions, will
meet with due honor when presented at the office of the Bank in Orange County, California.

The obligations of the Bank shall not be subject to any claim or defense by reason of the
invalidity, illegality, or inability to enforce any of the agreements set forth in the Lease.

This Letter of Credit is subject to the International Standby Practices–ISP98, International
Chamber of Commerce Publication 590 when not in conflict with the express terms of this Letter of
Credit.

This Letter of Credit shall terminate at 3:00 p.m. Pacific Standard Time on April 1, 2013, which
shall be the final expiration date of this Letter of Credit, unless, at least 60 days prior to the then current

EXHIBIT A
-1-

expiration date, we notify you in writing by certified mail, return receipt requested, at the following address (or at such other address as you may specify by written notice to us), that this Letter of Credit will not be extended beyond the current expiration date; provided, that our obligation to make any payment hereunder in respect of a drawing request made prior to the expiry hereof shall continue until payment is made:

> MEF REALTY, LLC
> c/o The Muller Company
> 23521 Paseo de Valencia, Suite 200
> Laguna Hills, California 92653
> Attn: Jon Muller

Amounts drawn upon this Letter of Credit are to be endorsed on the reverse side of this Letter of Credit by the negotiating bank.

By: _____
Name: _____
Title: _____